| UNITED STATES OF AMERICA, PLAINTIFF, | |
|---|---|
| VS. | **AFFIDAVIT OF FBI TFO SETH MCMILLAN IN SUPPORT OF VERIFIED COMPLAINT FOR FORFEITURE IN REM** |
| $4,088 IN UNITED STATES CURRENCY, DEFENDANT(S) | |

I, Seth Patrick McMillan, having been first duly sworn, do hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I am an Anchorage Police Officer with the Anchorage Police Department and have been since November 2003. I previously was a Knoxville Police Department officer from 2000-2003. My current assignment is as a Federal Task Force Officer with the FBI Safe Streets Violent Crime Squad. During this time, I have been assigned duties in Patrol, Training, SWAT/Special Assignment Unit, Investigations and FBI Safe Streets Task Force. During my career as a Police Officer, I have been involved in numerous investigations of robberies, burglaries, thefts, fraud, homicides, felony and misdemeanor assaults, sex offenses, vehicle collisions, narcotics and other misdemeanor and felony crimes. These investigations have included applications for, and the receipt and execution of, numerous search warrants for the seizure of evidence pertinent to the investigation. In addition to my formal education, I have completed thousands of hours of training covering

a variety of law enforcement related topics, including but not limited to: Licensed Mobile Intensive Care Paramedic, Hazardous Materials Technician, Crisis Negotiator, Field Training Officer, Immediate Action Rapid Deployment – Active Shooter Instructor, Hostage Rescue, Kinetic Energy Projectiles, Noise Flash Diversionary Devices, Methods of Instruction, Vehicle Pinning and Mobile Surveillance, Covert Search Techniques, Defensive Tactics Instructor, Uniformed Investigator course, Introduction to Clandestine Laboratory Investigations, High Risk Patrol Search Tactics, Reid Basic/Advanced Interview & Interrogation, Informant Development, LAPD SWAT Team Leader course, Crisis Intervention Team, Drug Enforcement Administration 80-hour Basic Drug Enforcement Course, State of Alaska Crime Laboratory Drugs in Alaska course, Glock Armorer, H&K Armorer, Sig Sauer Armorer, Remington Armorer, ARWEN Armorer, Firearms Instructor, USAFSOS Dynamics of International Terrorism Course, Advanced Roadside Impaired Driving Enforcement course, DEA Operation Jetway commercial transportation interdiction course, Pen-Link forensic data intercept course, Officer Survival Instructor, Cellular Analysis Surveillance Team (CAST) course, Commercial Vehicle Interdiction course, US Marshal Service High Risk Fugitive Apprehension course, Investigating Drug Trafficking Organizations course, Alaska Police Standards Council Instructor (APSC), APSC Advanced Police Officer Certificate and I have also been recognized in Anchorage Superior Court and United States District Court, District of Alaska, as an expert on drug distribution, identification and trafficking.

2. NARCOTICS TRAFFICKING

3. I have become familiar with the methods commonly used by drug traffickers. I have

become familiar with cases involving the investigation and prosecution of defendants for violations of Title 21 U.S.C. § 841(a)(1) and (b)(1)(A) (distribution of controlled substances and possession with intent to distribute controlled substance) and § 846 (drug conspiracy), as well cases involving the investigation and prosecution of defendants for violations of State of Alaska Statutes 11.71.010-060, Misconduct Involving Controlled Substances I-VI.

4. In my experience, I have found the distribution of controlled substances is frequently a continuing activity over months and years. Persons involved in the trafficking of controlled substances typically will obtain and distribute controlled substances on a regular basis, much as a distributor of a legal commodity would purchase stock for sale. Similarly, such drug traffickers will maintain an "inventory" which will fluctuate in size depending upon the demand for and the available supply of the product.

5. It has been my experience drug traffickers keep records of their illegal activities not only during the period of their drug trafficking violations but also for a period of time extending beyond the time during which the trafficker actually possesses/controls illegal controlled substances. Drug traffickers keep these records to maintain contact with criminal associates for future transactions and so that the trafficker can have records of prior transactions for which the trafficker might still be owed money (or might owe money to someone else). Such records may be found in the form of text messages on cell phones, or emails on targets' computers, tablets, smart phones, or messages and postings on social media accounts.

6. It is common for members of drug trafficking organizations to maintain records

evidencing their illegal activities including books, ledgers, receipts, notes and other papers relating to the transportation, ordering, possession, sale and distribution of drugs and the collection and transportation of drug proceeds. I also know the records are frequently maintained in the drug trafficker's residence and sometimes in the traffickers' vehicle(s), computers, tablets, smart phones, or social media accounts.

7. I know evidence of excessive wealth is probative evidence of crimes involving greed, to include the distribution of controlled substances. Therefore, receipts showing the expenditure of large sums of money and/or the expensive assets themselves are evidence of drug trafficking. I also know drug traffickers commonly keep the expensive assets themselves and/or documentation of the purchase of the asset (receipts, warranty cards, etc.), or pictures of themselves with the items, in or about their residences, and sometimes documentation of these assets in their vehicles, businesses, smart phones, tablets, computers, or social media accounts.

8. It is increasingly common for members of drug trafficking organizations to utilize direct cash deposits into a co-conspirator's bank accounts to facilitate the movement of U.S. currency throughout the trafficking organization's area of operations. I know members of drug trafficking organizations will utilize nominee depositors to disguise the origination of the funds and to break up the amount being deposited by any one person. I know the actual owner of the currency will commonly provide the nominee depositor with information concerning the intended recipients name and account number and amounts of money to be deposited. I also know, to keep track of the proceeds, it is common for the drug traffickers and/or nominee depositors to maintain copies of the deposit slips. Drug

traffickers also frequently send/receive photographs of deposit slips, including via social media, and thus analysis of social media accounts can provide evidence of drug trafficking and money laundering violations.

9. It is common for members of drug trafficking organizations to utilize express parcel delivery companies (i.e. Federal Express, United Parcel Service, DHL and US Postal Service Express Mail) to facilitate the movement of controlled substances and US currency throughout the trafficking organization's area of operations. I also know, to keep track of the packages and their contents, it is common for the trafficker to maintain copies of the shipping receipts and tracking numbers. I know that members of drug trafficking organizations will utilize nominee senders/recipients to disguise the origination and destination of the packages. I know that the actual owner of the drugs/currency will commonly provide the nominee sender with information concerning the intended recipient's name and address. Drug traffickers also communicate about the packages via social media, and thus analysis of social media accounts can provide evidence of drug trafficking and money laundering violations.

10. It is common for members of drug trafficking organizations to utilize fraudulent identification, to purchase airline tickets, send wire transfers, rent residences and storage facilities, and subscribe for telephone/cellular telephone service. I also know it is common for drug traffickers to keep fraudulent identification nearby and easily accessible to facilitate their flight upon the discovery of their illegal activities by law enforcement. Records concerning the purchase of airline tickets, rental contracts, and telephone/cellular service are sometimes found on social media accounts.

11. It is common for drug trafficking organizations involved in the distribution of controlled substances to maintain equipment and supplies (i.e. scales, baggies, cutting agents) on hand over a lengthy period. At times, certain retail stores provide customers with loyalty cards that can track a customer's purchases. Frequently, these stores send emails to the members of their loyalty programs that can be found on the drug trafficker's social media accounts.

12. It is common for members of drug trafficking organizations to attempt to recruit couriers to transport drugs and/or US currency throughout the trafficking organization's area of operations. I know often the organizations will pay a flat rate (i.e. $2,000 per kilogram of cocaine) plus expenses for the couriers. Therefore, often the couriers will keep itemized lists of expenses and/or receipts, to be reimbursed. Evidence of visiting travel websites can often be found through forensic analysis of social media accounts.

13. It is common for members of drug trafficking organizations to take or cause to be taken, photographs and/or videos of themselves and their co-conspirators and associates. It is also common for members of drug trafficking organizations to take or cause to be taken, photographs and/or videos of themselves and/or their conspirators with controlled substances, large sums of money, guns and expensive assets (i.e. jewelry, luxury cars). I also know that the aforementioned items are frequently maintained in the drug trafficker's social media accounts.

14. It is common for members of drug trafficking organizations to disguise their identities and illegal activities, to use pre-paid cellular telephones and pre-paid long distance calling cards. I know that often, the only way to connect a subject with a particular

pre-paid cellular telephone or calling card is to seize the phone or calling card from the trafficker's possession or residence. Analysis of these pre-paid cellular phones often provide evidence of a drug trafficker's customers and suppliers, as well as accomplices. This information can be found in social media accounts.

15. It is common for members of a drug trafficking organization to attempt to legitimize their profits from the distribution of drugs. To accomplish these goals, drug traffickers utilize foreign and domestic banks and the bank's attendant services to include cashier's checks, safe deposit boxes, and money drafts. Drug traffickers will also utilize the purchase/sale of real estate to legitimize their profits. I also know that the records of the transactions are sometimes stored on computers and tablets, or social media accounts of drug traffickers.

16. Your affiant knows a cellular telephone (or mobile telephone or wireless telephone) is a handheld device used for voice and data communication through radio signals. These telephones send signals through networks of transmitters/receivers, enabling communication with other cellular telephones or traditional landline telephones. A cellular telephone usually contains a "call log", which records the telephone number, date, and time of calls made to and from the cellular telephone. In addition, to enable voice communication, cellular telephones can send and receive data from the Internet and perform from an operating system, much like a home computer. Cellular telephones offer a broad range of capabilities which include: storing names and telephone numbers in an electronic address book which also might be known as a contact list; sending, receiving, and storing text messages communication and electronic mail; taking, sending, and storing

Page 7 of 15

Case 3:22-cv-00243-SLG   Document 1-1   Filed 11/07/22   Page 7 of 15

digital photographs and moving video; recording, storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and downloading/uploading data from the Internet. Cellular telephones may also include global positioning system (GPS) technology used for determining and logging the location of the cellular telephone.

17. It has been my experience narcotics traffickers use cellular telephones to facilitate the distribution of narcotics. In doing so the use of a cellular telephone by traffickers often leaves evidence of distribution of controlled substances, intent to distribute controlled substances and conspiracy. This evidence can be found through the stored, historical call logs; by storing names and telephone numbers in an electronic address book which also might be known as a contact list; sending, receiving, and storing text messages communication and electronic mail; taking, sending, and storing digital photographs and moving video; recording, storing and playing back audio files; storing dates, appointments, and other information on personal calendars; GPS location data and downloading/uploading data from the Internet.

18. I also know narcotics traffickers use cellular telephones to convey banking information and information about the transfer or shipments of drug proceeds. Specifically, narcotics traffickers often use cellular telephones to relay tracking numbers of packages containing drug proceeds send from one location to another. It has also been my experience to know narcotics traffickers also maintain possession of more than one cellular telephone for the purpose facilitating the distribution of narcotics and moving and laundering drug proceeds.

19. I know that narcotics traffickers use mobile payment applications that facilitate movement of funds between users using a mobile telephone application. These services allow users to request and transfer money between accounts (i.e. CashApp or Venmo), then choose to withdraw the month by way of banking debit cards, automatic teller machines (ATMs) or transfer the funds to a bank account. These services interact with social media platforms. Similar "digital wallet platforms" (i.e. Apple Pay or Google Pay) allow transactions between users digitally on applications, the Internet, or in-person using unique identifiers and PIN features to ensure security. In my experience, narcotics traffickers will utilize these services to facilitate payments and request funds to expedite transactions and increase financial security of those transactions.

20. The purpose of this affidavit is to establish probable cause that the seized $4,088.00 in US currency is proceeds of and was intended ot be used in furtherance of drug trafficking. I believe said currency is also subject to forfeiture to the United States as proceeds of drug trafficking under Title 21 USC 881(a)(6) based on violations of 21 USC 841(a)(1).

21. The $4,088.00 in US Currency was seized during a search warrant executed at 3209 Turnagain Street #4, on May 24, 2022.

22. The facts in this affidavit are based on my own personal knowledge, knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers, interviews of witnesses, a review of records related to this investigation, communications with others who have knowledge of the events and circumstances described herein, and information gained through my training and

experience. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

**FACTS IN SUPPORT OF PROBABLE CAUSE CONCLUSION**

23.  In 2020, law enforcement authorities identified a Drug Trafficking Organization (referred to herein as DTO) operating between Alaska, Tennessee and Georgia, responsible for the importation of illegal narcotics into Alaska for distribution, with the proceeds of the drug trafficking being transported from Alaska back into the Lower 48 states. In June of 2021, Drug Enforcement Administration (DEA) in Anchorage, Alaska received Organized Crime Drug Enforcement Task Force (OCDETF) program approval for this continuing investigation, predicated by DEA file number RG-20-0024. OCDETF investigation number is PA-AK-0095.

24.  In July through August of 2021 an individual named LARRY JOE KENNEDY was identified by a Court approved Pen Register under OCDETF PA-AK-0095 as having frequent contact by way of interstate electronic communications, specifically phone calls and text messages with members of the DTO. The phone number used by KENNEDY was 907-205-2315.

25.  KENNEDY has multiple misdemeanor and felony convictions for drugs, larceny, assault, shoplifting, resisting arrest, driving with suspended license and patronizing prostitution.

26.  In July of 2021, a Federal Bureau of Investigation (FBI) Confidential Human

Source (referred to herein as CHS-1) provided information that KENNEDY and ERICA ELISOFF were distributing crack cocaine in the Anchorage, Alaska area. In August of 2021, the FBI was added to OCDETF PA-AK-0095 as a participating Federal Agency.

**27.** ELISOFF has multiple misdemeanor and felony convictions for drugs, assault, theft, failure to appear and driving without a license.

**28.** The investigation to date has identified KENNEDY and ELISOFF as being in a domestic relationship, and living at both 3209 Turnagain in both apartments #3 and #4.

**29.** In substantiating the aforementioned relationships, an Anchorage Police Department (APD) records, Alaska Corrections Offender Management System (ACOMS), and Alaska Public Safety Information Network (APSIN) check showed the following: ELISOFF claims 3209 Turnagain Apartment #4 in APSIN for her Alaska ID; KENNEDY claims 3209 Turnagain Apartment #4 in APSIN for his Alaska ID; in three incidents involving APD since 2015, KENNEDY has claimed his residence twice as 3209 Turnagain Apartment #3, and once as 3209 Turnagain Apartment #4; KENNEDY and ELISOFF are co-registered on a 2003 GMC Yukon, Alaska plate LEC159, using 3209 Turnagain Apartment #3; KENNEDY and ELISOFF are co-registered on a 2000 GMC Sierra pickup, Alaska plate FTM457, using 3209 Turnagain Apartment #3; in 2019 ELISOFF listed KENNEDY as a "significant other" while incarcerated (ACOMS); in April 2019, APD patrol officers responded to an assault report involving KENNEDY and ELISOFF, and they were determined to be in a domestic relationship residing in 3209 Turnagain Apartment #3 (APD Case 19-14348); in July 2013, APD patrol officers conducted a felony drug investigation where KENNEDY called ELISOFF his

"girlfriend" (13-27927). KENNEDY's association with 101 A Street Loop #7 has been established by conducting a narcotics transaction with CHS-1 in August 2021 at 101 A Street Loop #7, prior to and during which KENNEDY's actions demonstrated standing and authority at 101 A Street Loop #7, by his own statements, and including access to the office area, knowledge and control of surveillance cameras inside the business and having his child present during the deal.

**30.** CHS-1's criminal history includes multiple misdemeanor and felony convictions for drugs, driving under the influence, prostitution, failure to appear, assault, false information and trespass. CHS-1's last convictions were in 2001 for State of Alaska charges of Misconduct Involving a Controlled Substance IV and False Information related to giving a false name while being contacted for an outstanding warrant. Information provided by CHS-1 has been determined to be credible after being verified by other sources, including surveillance by law enforcement. CHS-1's motivation for cooperating with law enforcement is financial compensation.

**31.** The aforementioned law enforcement surveillance, database searches, and phone calls and contact between CHS-1, KENNEDY and ELISOFF, based off my training and experience, indicate that ELISOFF and KENNEDY are not independently distributing crack cocaine, but are cooperating with one another and are part of the same distribution network, utilizing 3209 Turnagain Apartment #3, 3209 Turnagain Apartment #4.

32. On May 14, 2022, the following search warrants were issued in United States District Court, District of Alaska:

Authorizing the search of 3209 Turnagain Street, Apartments #3 and #4, 3:22-mj-00153-

MMS.

Authorizing the search of 101 A Street Loop #7, 3:22-mj-00154-MMS.

Authorizing the search of a Chevrolet Tahoe, Alaska plate DHC423, 3:22-mj-00155-MMS.

Authorizing the search of a Cadillac Deville, Alaska plate FBB890, 3:22-mj-00156-MMS.

The warrants issued on May 14, 2022 were predicated on three controlled purchases of crack cocaine utilizing a Confidential Human Source (CHS)-1 from KENNEDY and ELISOFF between August 2021 and December 2021. Two of the purchases were arranged by CHS-1 contacted KENNEDY at phone number 907-205-2315. The aforementioned physical locations and vehicles that were subjects of the warrants had been identified as being in possession and control of and used to facilitate the sale of crack cocaine by KENNEDY and ELISOFF.

33. On May 24, 2022, the Anchorage FBI Violent Crime Squad and other law enforcement partners executed the aforementioned warrants, with the exception of 3:22-mj-00156-MMS for the Cadillac Deville, as it could not be located.

34. The 101 A Street Loop #7 location was occupied solely by JAMES THOMAS GAY JR. (DOB 12-15-69). GAY provided an unrecorded statement that LARRY JOE KENNEDY owns the shop and comes to the shop every day at different times. GAY said that KENNEDY is allowing him to sleep there because he was homeless.

35. 3209 Turnagain Street #4 was unoccupied. 3209 Turnagain Street #3 was occupied by:

• KOBE BROWN (DOB 01-31-03)

• ROBERT SHAVCLAN (DOB 08-24-80)

- JESSIE RODRIGUEZ (DOB 09-07-78)

- RICKI BIGGS (DOB 08-18-93)

- AUDREY BROWN (DOB 10-31-64)

- LARRY KENNEDY (DOB 11-24-59)

36. BROWN, SHAVCLAN, RODRIGUEZ, BIGGS and BROWN exited #3 almost immediately upon notice of a search warrant execution. KENNEDY refused to exit initially, and told negotiators by phone repeatedly that he was inside #4. However the other occupants told agents that KENNEDY was inside #3. KENNEDY exited #3 after 8 minutes.

37. BROWN, SHAVCLAN, RODRIGUEZ, BIGGS and BROWN were positively identified, contact information obtained, and were instructed to leave the area during the search warrant service.

38. An interview of KENNEDY by TFO MCMILLAN and DEA SA ROSE was attempted, but KENNEDY did not provide a statement.

39. Evidence of significant investigatory value seized or observed and photographed from 3209 Turnagain Street #3 and #4 included:

- $127,188 US currency
- 66.4 grams suspected fentanyl pills
- 3433.6 grams suspected powder cocaine
- 859.3 grams suspected heroin
- 62.4 grams suspected methamphetamine

- Scales and drug packaging material
- USPS Mail addressed to both KENNEDY and ELISOFF at both #3 and #4
- A white iPhone, found in #3 on a table next to a recliner.

Evidence of significant investigatory value seized from 101 A Street Loop #7 included:

- A loaded handgun

40. Based on the foregoing, I believe there is probable cause to believe that the seized $4,088.00 in US currency from the residence of KENNEDY and ELISOFF at 3209 Turnagain Street #4, Anchorage, Alaska, is proceeds of and was intended to be used to facilitate drug trafficking activities by KENNEDY and ELISOFF and subject to forfeiture to the United States pursuant to Title 21, USC 881(a)(6).

I declare the foregoing is true and correct to the best of my knowledge and belief.

Executed on November 7, 2022 in Anchorage, Alaska.

Seth Patrick McMillan
Task Force Officer, FBI



Subscribed and sworn before me this 7 day of November, 2022 at Anchorage, Alaska.

Notary Public, State of Alaska
My commission expires on 11/10/2026